OPINION
Appellant Emma Mitchell, Executor of the Estate of Richard Mitchell, appeals the decision of the Stark County Court of Common Pleas that rendered a verdict in favor of Appellee Altercare of Canton ("Altercare"). The following facts give rise to this appeal. On December 17, 1998, Richard Mitchell, age sixty-five, was admitted to Appellee Altercare for rehabilitation following a stroke. Due to the stroke, Mr. Mitchell could not speak or swallow because his right-side was paralyzed. It was also determined, at the time of his admission, that Mr. Mitchell had a high choking risk. Because Mr. Mitchell was not able to eat or drink anything, he was fed via a peg tube surgically inserted into his stomach. Mr. Mitchell was also designated an "NPO" resident, which means nothing by mouth. On the morning of December 20, 1998, Mr. Mitchell died due to asphyxiation from a piece of meat lodged in his throat. On April 28, 1999, appellant filed a personal injury action for survivorship and wrongful death. This matter proceeded to trial on March 6, 2000. On March 10, 2000, the jury rendered a verdict in favor of Appellee Altercare finding that its employees were not negligent in their care of Mr. Mitchell. The trial court journalized the entry on March 16, 2000. Appellant filed a motion for new trial on March 24, 2000. The trial court overruled appellant's motion on April 12, 2000. Appellant timely filed her notice of appeal and sets forth the following assignment of error for our consideration:
 I. THE JURY VERDICT RENDERED IN THIS MATTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 I
In her sole assignment of error, appellant contends the jury's verdict finding no negligence on the part of Appellee Altercare and its employees is against the manifest weight of the evidence. We disagree. As an appellate court, we are not fact finders. We neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction (1978),54 Ohio St.2d 279, 281. It is based on this standard that we review appellant's assignment of error. In support of this assignment of error, appellant argues the evidence presented to the jury clearly established that Appellee Altercare and its employees deviated from the required standard of care. Further, based on the answers to the jury interrogatories, appellant argues the jury based its decision solely on the issue of negligence and did not consider the issues of proximate cause or comparative negligence. In order to maintain a cause of action for negligence, appellant must establish the following three elements: (1) that appellee owed a duty to appellant; (2) that appellee breached that duty; and (3) damage proximately resulting from the breach. See Jeffers v. Olexo (1989), 43 Ohio St.3d 140, 142; Menifee v. Ohio Welding Products, Inc. (1984), 15 Ohio St.3d 75, 77. Appellant sets forth three arguments regarding the issue of standard of care. First, appellant contends Appellee Altercare, and specifically, Nurses Tara Hertel and Amy Glass, failed to properly assess Mr. Mitchell's condition as they completed their early morning rounds. The record supports the conclusion that when Nurses Hertel and Glass observed appellant on the morning of December 20, 1998, he was displaying the type of behavior he had displayed on the two previous mornings. This is supported by the testimony of Nurses Hertel and Glass. Nurse Hertel testified as to appellant's condition, during his stay at Altercare, as follows:
 Q. Now, did you have an occasion during the morning hours of December 20 to observe Mr. Mitchell in a condition in which feces were over his body?
A. Yes, both nights he had had that problem.
Q. Both nights?
A. Uh-huh.
 Q. Tell us about the first incident and tell us what you did.
 A. Like I said, he had been restless that first night; and he was just constantly his right hand was all over the place, and we did put a diaper on him because he was always down below; and he had just wiped BM all over hisself, so we just had him cleaned up. Tr. Vol. IV at 971.
* * *
 Q. When you say that he was resistive, was that the same experience that you had with him during the morning hours of the twentieth?
A. Correct.
 Q. And explain to the ladies and gentlemen of the jury what you mean by he was resistive?
 A. He would fight us. He would try to push our hands away. He didn't want us near him. He would grab our hands. He didn't want us to clean him up. He didn't like to be turned.
 Q. Were you able to accomplish the initial clean-up on the nineteenth?
A. Yes.
Q. And when's the next time that that occurred?
A. The following night. Id. at 972.
Based on the testimony of Nurse Hertel, this was the type of behavior displayed by Mr. Mitchell on the two days prior to his death. Nurse Hertel further explained that the above behavior displayed by Mr. Mitchell was the same behavior that she observed on the morning of his death. Q. And tell us what you observed that morning when you went in that morning [the morning of his death]?
* * *
A. He was doing the same thing that he had done earlier. He was real agitated. His face was a little red. He was grabbing at things, and he had BM all over him again.
* * *
A. We tried to put his oxygen back on because he just constantly took his oxygen off both nights that I had him. We tried to get that on because he was just real agitated, and we decided that maybe we should get him up for a shower because he was really covered this time.
* * *
A. * * * I told the aid, two aids to go ahead and try to get him up for a shower because he was real agitated. That's when I was doing rounds with the other nurse.
* * *
Q. And at the time you went in his room that morning at approximately 6:50, was he breathing? A. Yes.
Q. Did you see any difference in his condition from what you had observed at 4:00 in the morning?
A. No.
Q. Did you see any difference in his condition from what you had observed the day before?
A. No.
* * *
Q. Did you have any reason to believe that he was getting ready to experience a respiratory distress situation?
A. No. Id. at 974-976.
Nurse Glass also testified as to what she observed upon entering Mr. Mitchell's room on the morning of his death. A. * * * He was not blue. I did not feel in any uncertain terms that he was in respiratory distress. I said I didn't have to take vital signs because agitated is going to have an elevated blood pressure and elevated pulse. I felt this was appropriate measures for this time. Id. at 1007-1008.
It was not until a nurse's aid summoned the nurses that they knew there was a problem with Mr. Mitchell. Id. at 1010. Based on the above testimony, we conclude there was relevant, competent and credible evidence upon which the jury could find that Appellee Altercare and its employees did not fail to properly assess Mr. Mitchell's condition on the morning of his death. Appellant next argues that Appellee Altercare and its employees failed to render care in a timely fashion and failed to follow proper CPR protocol. In support of this argument, appellant cites to the various times recorded in the nurse's notes. However, Nurse Hertel explained, at trial, that the times contained in the nurse's notes are not the most accurate because the notes are written after the incident and the nurses do not have a clock or watch in front of them as the incident is occurring. Tr. Vol. II at 343-344. Nurse Glass further testified that she could not state with certainty that CPR began at 7:20 a.m. because the times recorded in the nurse's notes are not exact. Id. at 367-368. Appellant also challenges the nurse's decision concerning when they began CPR. Appellant maintains the nurses waited too long to start CPR. However, Nurse Glass testified that they can only begin CPR once the person has stopped breathing and chest compressions can begin only after the heart has stopped beating. Id. at 374-375. Appellant also challenges the nurses' failure to discover that Mr. Mitchell had an obstructed airway. The record indicates that Nurse Hertel did perform a finger sweep of Mr. Mitchell's mouth prior to initiating CPR. Id. at 333. Nurse Glass testified that it was not necessary to proceed to obstructed airway management because Mr. Mitchell was not permitted to have anything by mouth, therefore, an obstructed airway was not considered a possibility by the nurses. Id. Appellant further challenges the nurses' decision not to perform the Heimlich maneuver or stomach thrusts. Nurse Hertel explained that it is not necessary to do such procedures on someone that is not to be taking anything orally. Id. Nurse Glass also testified on this point and stated as follows: A. Abdominal thrust, okay, knowing what I knew and the knowledge that I had on Mr. Mitchell, I knew that he was ordered by the physician from the hospital he was NPO. He was on a tube feed at 125 cc's an hour. That is equivalent of four medicine cups plus a small amount in a fifth per hour. If I would have gone while this man, we are trying to code him, went forcibly and just went like this to do an abdominal thrust, what I would have essentially been doing was pushing four medicine cups plus a little bit more up into the windpipe; and essentially if you can drown on just a teaspoon of water, then you can definitely cause great harm by pushing 125 cc's into a man who is lying on the floor. You can cause him a lot of harm. Tr. Vol. IV at 1014-1015.
Appellee's expert, Dr. Daniel Cannone, also reached the same conclusion that the Heimlich maneuver or stomach thrusts could have resulted in Mr. Mitchell aspirating. Id. at 877. Finally, Bill Belba, of Stark Ambulance, testified that a finger sweep of Mr. Mitchell's mouth would not have discovered the piece of meat lodged in his throat because the meat was sitting on top of the vocal cords. In fact, Mr. Belba was only able to remove the meat with a tool known as Magill forceps. Id. at 953-955. Based on this testimony, we conclude there was relevant, competent and credible evidence upon which the jury could find that Appellee Altercare and its employees did not fail to render care in a timely fashion or fail to follow proper CPR protocol. Having found no breach of duty, it was not necessary for the jury to address the issues of proximate cause or comparative negligence. Accordingly, the judgment rendered in favor of Appellee Altercare is not against the manifest weight of the evidence. Appellant's sole assignment of error is overruled. For the foregoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.
 _____________________ Wise, J.
Farmer, P.J., and Edwards, J., concur.